Our next case for today is 2020-60281, Shrimpers and Fishermen of the RGV, et al. versus United States Army Corps of Engineers. Mr. Matthews, you may proceed. Thank you, Your Honor. My name is Nathan Matthews, arguing on behalf of petitioners, Shrimpers and Fishermen of the Rio Grande Valley Sierra Club and Save RGV from LNG. Petitioners bring three claims against the Army Corps of Engineers regarding its approval of the Rio Grande liquefied natural gas terminal and the Rio Bravo pipeline. First, for the terminal, the Corps violated the Clean Water Act by approving a terminal layout that destroys more wetlands than necessary, because the design includes space for a sixth liquefaction unit that is not needed for the project purpose. Second, the Corps failed to justify approving a design that puts a pipeline compressor station in wetlands. And third, for the pipeline as a whole, the Corps entirely failed to consider whether so-called temporary impacts to wetlands required mitigation. I'd like to discuss ripeness and then turn back to the merits of those claims. These claims are ripe. Ripeness balances fitness of the issues for review with the hardship of and here our claims were undeniably fit for review when we filed suit. This court plainly could decide whether, at the time the Corps issued the permit, that action was supported. That action was final and can be affirmed only on the record before the Corps, so there's no need for further factual development. And this is not one of the exceptional cases where post-decisional events justify postponing review. All that the Corps has said, and I'm reading its response brief at 14, is that future Corps action, quote, may moot some or all of the issues before this court. And even that seems to have been an overstatement, because nothing indicates that the Corps is actually reconsidering the terminal design or the pipeline mitigation issues that underlie two of our three claims. In the past six months, there have been no public statements from the Corps, no evidence of an inquiry lodged in the FERC docket, nothing. At most, the Corps has offered a mere possibility of reconsideration, and the Supreme Court has repeatedly stated that that's not enough. And even for our third claim on the compressor stations, although FERC is reconsidering the issue, the Corps hasn't committed to revisiting the permit at the end of FERC's process. Well, excuse me. Turning to the other right. Mr. Matthews, quick question. To what extent should the D.C. Circuit's kind of FERC case affect our disposition of this case? It shouldn't. You know, the D.C. Circuit case raises some similar issues, but the Corps' obligations under the Clean Water Act are much more specific and more stringent than FERC's obligation under NEPA and the Natural Gas Act. You know, if the D.C. Circuit were to hold that FERC didn't provide analysis that was even sufficient under NEPA, that would certainly suggest that the Corps hadn't met its Clean Water Act obligations. But the converse is not true. You know, the Clean Water Act puts a burden on the Corps and the applicants to clearly demonstrate that alternatives are completely impractical. And a finding that FERC had met its lesser obligations under NEPA or the Natural Gas Act wouldn't show that those findings were sufficient to meet the Corps' obligations under the Clean Water Act. Counsel, if we did not agree with you about the ripeness, just assuming arduendo, I'm not, just hypothetically, would the right remedy be to dismiss or would it be to hold in abeyance until these things are completed? We agree with the Corps that the right remedy would be to hold this in abeyance. The Corps' argument in its response brief is that the Court should hold these cases in abeyance until they become ripe, we think that judicial economy and, you know, impact on the parties and everything is that we believe that these cases are ripe and that the Court should decide them now. But if the Court disagrees and concludes that they're unripe, we believe that abeyance is the appropriate course of action. Do you have any idea how long it would likely take? Or maybe I need to ask the Corps, because we have a number of cases we've held in abeyance and like the EPA cases and things, and we find that they've been held in abeyance for years now. And, you know, and so if it was going to be something short, that's a reason to do abeyance, but not if it's going to go on and on for years and just sit on our docket. I did not have a sense of how quickly the Corps is likely to act here. Okay. Go ahead with your argument. I'm sorry. Go ahead. No, no, I appreciate the question. Mr. Massey, though, what is your best Fifth Circuit case from our Court to support the argument that this position is ripe today for review? I would point to either Chevron versus Traylor or American Forest Paper, which are both cases where the Court found that the case was ripe on both the fitness and substantial possibility of harm prongs, even though the harm was contingent on future actions that were not certain to occur. In Chevron, it was about Chevron being asked to indemnify for well plugging that nobody knew. But are there any cases that address ripeness concerns when an agency has suspended a permit after a petition for review has been filed? I'm not aware of any case that addresses this specific fact pattern under the Corps' regulation at Section 325.7, I believe it is. Other circuits have held that, in general, just a stay of agency action is not itself sufficient to defeat ripeness, both the Third Circuit and the D.C. Circuit. But they haven't considered suspension under this permit provision, nor am I aware of a Fifth Circuit case dealing with stay of agency action more broadly. But I do believe that this Court's decisions in Chevron and in American Forest Paper support finding ripeness here, because in those cases, the Court explained that all that is required when the fitness prong is satisfied is a substantial possibility of harm that would result from delaying review. And in both of those cases, it's not certain that harm was going to occur, but it was a demonstrated possibility, and the Court went on to consider the merits without waiting for that possibility to be actualized. In contrast, the only times that this Court has dismissed a challenge to a final action as unripe is a case like Lopez v. City of Houston, where there was truly no chance that delaying review would impose a hardship. In Lopez, it was because the Court was certain that the case was going to become moot before consequences could be felt. And here, we do face a risk of hardship, because if the Court delays review until the Court reinstates the permit, there's a real danger that construction will occur in violation of the Clean Water Act before we can secure further judicial review. And that might be construction in wetland, but we would also be harmed by construction that occurs in a way that we're saying the Court ought to require to reduce further wetland impacts down the road, that any construction at the terminal site makes it more difficult for us to secure wetland protection going forward. So, can you explain that again? I'm sorry, because I thought that they had to lift the suspension in order for more construction to occur, and that couldn't happen until after reconsideration. Am I wrong on that? No, you're correct, Your Honor. Our concern is that they will lift the suspension, and they may lift the suspension mere days before when the applicant or the developer is ready to start construction. So, it's a race to the courthouse before the shovel hits the ground, basically, then? Right. And the petitioners here have been very diligent in quickly presenting our claims to the Court to try and ensure that we're not sitting on our rights, that we don't want to seek a stay, we'd rather just have the Court decide this. If the Court reinstates the permit and construction is imminent, certainly we would be in a position to attempt to seek a stay, but that's an inadequate remedy for both logistical and doctrinal reasons. Logistically, even if we diligently brief a stay and the Court requires a prompt response from the Court, we don't know that that time frame will be enough for the Court to act before construction occurs. And then doctrinally, right now we're asking the Court to rule on the merits, and if we succeed on the merits here, then under the Supreme Court's decision in Monsanto versus Geertsen Seed Farms, the presumptive remedy is vacature. We believe that we would be entitled to a stay if we briefed that, but as a doctrinal matter, we might be entitled to vacature on the because we can't get a stay without succeeding on the four preliminary injunction factors. I'd love to talk about the merits. And the merits here are straightforward. We have three claims about the terminal layout, the compressor station, and the pipeline impacts. And on each, the Court simply failed to make the inquiries or findings required by the Clean Water Act. On the terminal footprint, the regulations implementing the Clean Water Act require the Court to avoid wetland impacts to the maximum extent practicable. As this Court held in City of Shore Acres, the Clean Water Act requires specific evidence to clearly demonstrate that a less damaging alternative is infeasible, and the burden is on the applicant and the Court to show that wetland impacts are justified. And the Court didn't meet that burden here. The Court stated in its decision memo that it was relying on the environmental impact statement prepared by FERC for the Court's Clean Water Act alternatives analysis. But in between issuance of that environmental impact statement and the Court's issuance of the permit, the project developers changed the project. They signed contracts for a changed terminal design that would increase output to a level that, on its face, could meet the project purpose with five liquefaction units rather than the approved six. Petitioners called this change to the agency's attention in a request for supplemental need for review seven months before the Court issued its permit. We reiterated the issue directly to the Court in comments the Court received four months before issuing the permit. The Court acknowledged in its decision memo that we had raised the issue, but the Court then ignored it and provided no analysis whatsoever of whether a five-train design could meet the project purpose or reduce wetlands impacts. In its brief, the Court argues that it reasonably relied on FERC's conclusion that even under the new high-capacity design, five trains wouldn't meet the purpose. There's no FERC determination on that in the record. Even the extra record material cited by the Court, which is the FERC-ordered not denying rehearing, fails to provide the type of evidence needed to show that an alternative is impracticable for purposes of the Clean Water Act. FERC speculated that a five-train design might not be feasible, but that's not enough under the Clean Water Act, which requires a clear demonstration that an alternative is impractical. Moving on to the compressor station, again, the Court's brief doesn't dispute that moving the compressor station would be less environmentally damaging. The Court solely argued about practicality, but nowhere in the record did the Court or FERC assert that moving the compressor station would be infeasible. FACS would not have supported such an assertion. At most, the record indicates a preference for putting the compressor next to the terminal, but nothing distinguishes the many similar projects that don't have a compressor station next door, nor is there any specific factual information explaining why an adjacent compressor station is an impracticable option here. Finally, for the pipeline itself, 120 acres of wetlands will be destroyed during pipeline construction, and the plan is to restore those wetlands, but the Court's brief admits that the fact that those impacts are not permanent does not mean that the Clean Water Act does not require mitigation of that harm. Mitigation may be required even for temporary impacts, and the Court also admits that here it did not explicitly state any analysis or conclusions as to why these particular temporary impacts did not require mitigation, nor does the Court identify any portion of the record even implicitly addressing that issue. And that settles it, because this Court can only affirm on a basis articulated by the agency in the record. Here, the petitioners, but also the Fish and Wildlife Service, and the EPA, all commented that the pipeline construction impacts here needed a closer look and potentially required mitigation, and the Court's complete failure to address this issue renders the Court's approval arbitrary. So you have a minute and a half left. Are there any questions? As long as they made the decision with the available information at the time, do they have, is there a duty to revisit their decision when they get more information? In what case provides for that? I'm not aware of a specific Clean Water Act duty to revisit once they get more information. Our claim is that on the information available at the time, their decision to revisit the clearly unsupported. The decision to increase the output of each liquefaction unit was made seven months before the Court issued its permit. We had called it to the Court's attention multiple times. Similarly for the pipeline compressor station. So, although I'm not aware of a Clean Water Act duty to consider post-decisional information, we're not relying on any such duty here. Our claim is the decision was arbitrary at the time it was issued. But if the intervener's design plans evolved since the time they make the decision. They evolved in between issuance of the environmental impact statement and the Corps' permitting decision. So there is a duty to consider the information before the Corps at the time it makes its decision. You know, and to be candid, we are in our FERC case bringing a claim about a supplemental, a duty to supplement the NEPA analysis. But we are not bringing a NEPA claim against the Corps here. I think you've saved time for rebuttal, counsel. Thank you. Thank you, Your Honor. Ms. Jaffe? You're on mute. You're not anymore. Thank you, Your Honor. May it please the Court. Rebecca Jaffe appearing on is not ripe. After the Corps issued the original permit in February of 2020, circumstances changed. At the time the Corps issued the permit, the project developers were planning to build a facility with six liquefaction trains and with Compressor Station 3. The Corps issued the permit in February. In June, the pipeline company sought FERC authorization to modify the pipeline and among several changes to remove Compressor Station 3. In July, Rio Grande, the terminal developer, notified FERC that it was going to do five liquefaction trains at the facility instead of six. Those design changes were not in place until after the Corps issued the permit. The developers then asked the Corps to suspend the permit and the Corps did so. While the permit is suspended, the developers may not disturb any waters of the United States. The Corps is currently considering these design changes, some of which FERC has already approved, some of which it has not yet officially approved, and when it finishes the reconsideration process, the regulations allow the Corps to reinstate, modify, or revoke the permit. What is the timeline for that reconsideration process? Exactly, that's my question too. The Corps anticipates reaching a decision by the end of March. The Corps has a memorandum of understanding with FERC that says that within 90 days after FERC issues its final environmental assessment document, the Corps should issue its permit unless there are conditions that prevent it from doing so. FERC issued its final supplemental environmental assessment and analyzing the changes to the pipeline on December 21st, 2020. So, the 90-day timeline would put the Corps issuing a new decision around March 22nd of this year. So, is the D.C. Circuit consideration, is their proceeding irrelevant to the reconsideration timeline you just laid out for us? You're not waiting on a ruling from the D.C. Circuit before your own reconsideration proceedings for this permit? No, Your Honor, and the Corps has been working diligently on its reconsideration process. It's been going back and forth with the developers, asking them for more materials, more information about the design changes. So, it's not waiting for the D.C. Circuit. It's just going through its process. It did have to wait for FERC to finish its environmental process, which FERC did. So, would we return to this in April if we did wait? Is that what you're saying? That is the plan, Your Honor, yes. The Corps is likely to issue a modified permit. It's likely to be a different permit given that project developers are saying, we don't want to do exactly what we originally said we wanted to do. And so, we think the Court should hold this in abeyance until the Army Corps issues a new decision. Without pinning you down, you said that is kind of a plan that you anticipate end of March. But again, without pinning you down or holding you to it, what is your level of confidence that that chronological target will be met? It's pretty high. I've already seen a lot of the materials that the Corps has been reviewing, and it's got all of the materials that the developers have submitted, everything that the Corps has asked for. So, I think at this moment, they're doing their write-up. I should acknowledge that there is a new administration that came in, and I suppose that in the process of restaffing or staffing agencies with political appointees, things could slow down. But the Corps is certainly working diligently to reconsider the original permit and to evaluate the changes in the project. And when I say my confidence level is pretty high, I should explain, can I guarantee that it will be done by March 22nd? I can't. But can I say this won't take another year? Absolutely. I do feel very confident about that. Could it be a couple more weeks? Yes, those things happen, but it's not going to be a long reconsideration process because the Corps has already done so much. And that goes to one of the points petitioners made in their briefing, which is that the Corps should have vacated the permit. But it's not reconsidering the entire process. It's only reconsidering pieces of the permit. There are a lot of pieces of the whether this project will have impacts on contamination, whether this project will have impacts on navigation, whether it will have impacts on recreation, erosion, things like that are not really part of the Corps' reconsideration process. So that's why the Corps suspended the permit, and that's why it makes sense to hold this case in abeyance until the Corps issues a new decision. Now, opposing counsel says that I think two-thirds of it are not being reconsidered what they're complaining about. Do you quibble with that? I do. Yes, I do. Because the Corps' regulations give it the authority to reconsider the entire permit. The entire permit is suspended, and the Corps can reevaluate the entire permit. But I thought you just told us you weren't reconsidering everything and that some things are already done, and you just listed a whole bunch of things that weren't being reconsidered. I'm sorry, Your Honor. When you said two-thirds, I was thinking in terms of the footprint. The Corps is not reconsidering navigation, but it is reconsidering the pipeline route and the terminal route, and I apologize for not being clear about that. There's a public interest review process that the Corps has to undergo. It's not redoing all of that, but it is looking at the route. I understood Petitioner's argument to be that the temporary impacts argument they're making about temporary impacts from pipeline construction is not something the Corps is reconsidering, and I guess my point is the Corps is looking at changes to the pipeline, and it is considering that. Thank you. Did you want to address the merits? Yes, although it all turns back to ripeness again. Petitioners are saying that the Corps should not have permitted a facility that has Compressor Station 3. Well, right now, the Corps has an application in front of it saying we don't want to do Compressor Station 3. So, it may have been reasonable for the Corps to decide on Compressor Station 3 then. It's a different situation now. I think it circles back to ripeness, but I do want to emphasize that there are multiple agencies here in this process, and FERC is the agency that has the engineering expertise. Petitioners are saying that the Corps should have required or investigated whether developers could do a five-train design. At the time petitioners made that suggestion to the Corps, FERC was authorizing a six-train design, and FERC is the one that has the expertise in liquefied natural gas engineering. The Corps' expertise is really in wetlands of the United States, waters of the United States, excuse me. So, that's what the Corps was looking at, and at the time its decision was reasonable. And I would also note, I'm not sure what the Court would decide now if it were to rule on the least environmentally damaging practical alternative, because whether or not a facility has five trains or six, there has to be, the Corps needs to, now that it knows there's going to be five trains, it needs to look at what will the footprint of impact wetlands. So, I'm not sure how the Court could decide that now in any event. In terms of petitioners' argument about temporary impacts, the Corps reasonably imposed various measures to limit temporary impacts and reasonably concluded that because of these measures, compensatory mitigation was not required. The permit has several conditions, conditions six, seven, eight, nine, and ten that limit how long, that require specific best management practices and specific construction methods to ensure that the developers limit the duration and scope of the impacts. There's requirements on when they can do the work, how long they can take to do it, how they have to do it in terms of using mats or silt fencing. They can only place material into a wetland for no more than three months, that's permit condition seven. They have to restore temporary impacts at each water crossing within 30 days after they finish work, that's permit condition number eight. The developers must submit monitoring reports after they complete construction, that's permit condition number nine. And the Corps has authority to require more mitigation if it concludes that the crossings were not restored in a timely and The Corps reasonably concluded that these measures were sufficient to limit temporary impacts and mitigation was not required. And I think my best, my best case here would be APJA-FALIA, which is 894-F3D-692, in which this court said, yeah, the Corps could have explained its analysis better. It could have included more detail, but it was not arbitrary and capricious. If the court has no further questions, this case is not ripe. The court should hold it in abeyance and stay its hand until the Corps finishes its reconsideration process. Thank you. Thank you for your argument. Ms. Petronio. Peace to the Court. Beth Petronio on behalf of the intervenor developers. We concur with counsel for the Army Corps of Engineers that this case is not ripe and does not currently present an Article III case or controversy that is appropriate for judicial review at this time. The permit issued in February of 2020 is currently suspended and no construction can take place. And the Corps is expected, as Ms. Jaffe alluded, to issue a modified permit by the end of next month. All of the factors for ripeness here are met. You know, the argument that has been put forth to defeat the concept that this case is not ripe are that it's just a mere possibility and relying on the Sackett case for that. This isn't a mere possibility. We've had six months at this point of proceedings with the Corps. The Corps was required, once the permit modification request was made, to meet with the developers. They did so. They have been in constant communication with the developers for the past six months, and we have provided them with all of the information they have requested. And so, as I said, we're expecting a modified permit that addresses a completely different design. At this point, because we have FERC approval to build a five-train design, there cannot be a permit issued that authorizes a six-train design. We have no authority to build a six-train design anymore from FERC. So, at this point, it would be completely pointless. There would be no live case or controversy for this panel to address. And so, at this point, we should hold the case in abeyance. I want to address the petitioner's suggestion that there would be some harm and that we'd be racing to the courthouse to try and prevent shovels from going in the ground. The reality here is that there has not been a final investment decision made on this project. The final investment decision is the step in a magnitude that is really a green light to whether or not it's actually going to go forward. And the deadline for a final investment decision at this point has been moved to December 31st of 2021. With a permit issuing in March or even if that bled into April, there is no real worry that there's going to be shovels put in the ground. And if it did become an imminent issue, petitioners could certainly raise that with the court. But the concept or suggestion that we have harm because we are going to begin construction is just simply not an accurate reflection of the current state of the project. Can I ask a question? What you're saying is, as I understand it, there wasn't a final investment decision even when these briefs were done. That's correct. There has not been a final investment decision on this project. The way that these processes typically work is that the developers get the various authorizations from FERC and all the various permits that they're required to get, the Clean Water Act, the Clean Air Act, the Fish and Wildlife Service analysis. They get all those things done and then they move forward with a final investment decision to ensure that they will have the funding necessary to build what will be a multi-billion dollar facility and investment. Who are the investors in a typical case? I mean, there are a variety of financing firms. A variety of different investors who invest in companies that do all sorts of things. It's not necessarily limited to anyone category of investors. People who feel like investing in the liquefied natural gas industry in light of the fact that we are rich in Texas with liquefied natural gas that needs to get transported and that this pipeline will take things from that area of Texas down to the Gulf where they can actually be exported. People who find that to be an appropriate investment are the types of investment firms that would invest in this project. That decision gets made at a certain point in the project and that point has not yet occurred and is not likely to occur until later on this year. As we said, we believe that it's not appropriate for this court and this court does not have to let me briefly address with the one minute I have left. The merits issue, especially with respect to the terminal, there will always be technical developments that occur over time. That does not impose an obligation on the Army Corps of Engineers to assess every emerging technology that is available. At the point that this permit was issued, both the developers and FERC believed that it needed to be a six-train design. That was the belief until July of 2020 when an actual decision was made that it was technologically and from an engineering perspective feasible to do a different design. That's when they requested a FERC and they did what any reasonable developer would have done. They went to FERC and then they also came back and asked the Corps to modify the permit. That's what was done here. Unless the court has any questions on the other, I'm out of my time. Thank you. We have your argument. You've saved time for rebuttal, Mr. Matthews. Yes, thank you, Your Honor. I'd like to address a few points. The change in design in June of 2019, the developers signed contracts to increase the output of each liquefaction unit. At that point, simple arithmetic showed that five of the units using the design they had produced enough gas to meet the overall project purpose. Although council suggests that developers and FERC believed a whole six trains were necessary for a whole another year after the signing of those contracts, nowhere in the record or anywhere else that I'm aware of is there any evidence to support that belief. As we explained to FERC and to the Corps well before the permit was issued, basic arithmetic indicated that you only needed five of these units to get the job done well in advance of when the permit was issued. I'd also like to address what FERC has actually presently approved. What FERC has said is go ahead and build everything at the terminal as we originally approved it and just leave a blank space in the middle where the sixth train would have been. And our claim is that the Clean Water Act does not allow that. Rather than leaving a blank space where they could decide to come back and add a sixth train later, where none of the purpose involves having a sixth train, they need to consider whether they could move some of the infrastructure that's into that blank space to free up room to pull other things out of wetlands. And FERC has explicitly refused to consider that issue. FERC says you don't have to change the overall footprint or layout. It's fine if you don't want to build the sixth train right now, but you don't have to use the space freed up by omitting the sixth train to reduce also claiming that the Corps has a much more specific, clear obligation to consider everything that could possibly be done to reduce wetlands impacts. As to the question of the Corps' relationship with FERC, you know, if FERC had made the types of specific findings about infeasibility that speak to the requirements of the Clean Water Act, then we agree that the Corps would have been able to defer to FERC's engineering judgment. If FERC had said, you know, that a five train design will not work because it only provides an 8% design margin and this project actually needs a 10% design margin and here's why we think that, that would have been a very different fact pattern and we could understand why the Corps could have deferred to that kind of judgment. But FERC didn't do that. FERC didn't apply its purported expertise here to provide any sort of findings that the Corps can defer to. FERC just said we think maybe they would rather have a six train design and regardless of whether that's good enough under the Natural Gas Act or underneath, but it's not good enough under the Clean Water Act and every court that considered the issue confirms that the Corps has an independent obligation to ensure that the findings required by the Clean Water Act are made and that the Corps cannot rubber stamp on other agencies' decisions. A couple of other points, you know, I am not, as I mentioned earlier, there's nothing public demonstrating what the Corps has been investigating, the dialogue with the applicant, so I want to make clear that what I remember is that so far as I know there hasn't been anything about that and I still don't really know exactly what the Corps is or is not reconsidering insofar as the Corps just asserted that it doesn't feel like it has the competence to evaluate whether a five train design or a reduced footprint really could work. It seems to me that a logical response to that would be to ask FERC to inquire whether or not the project footprint could be reduced with a five train design that rather than leaving a blank space in the middle just shrinks the footprint and destroys fewer wetlands, but certainly there's nothing on the FERC docket demonstrating an inquiry from the Corps to FERC where the Corps asks FERC to consider that issue and when we asked FERC to consider that issue, FERC just said we don't have to. FERC never said that a five train design with a smaller footprint wouldn't work, FERC just said they don't need to decide that, which clearly is not enough to meet the Corps' obligations under the Clean Water Act. On the timing issue, there is a memorandum between the Corps and FERC wherein the Corps will try to make a decision 90 days after the last NEPA document. I'll just point out that the final EIS came out in, I believe, April of 2019 and the Corps didn't make its decision until February of 2020. There may be facts that mean that the Corps is more likely to stick to that timeline, to the 90-day timeline this time around, but in the past the Corps hasn't. And I see that I'm out of time, so there are no further questions. Thank you for your consideration, Your Honors. Thank you. We appreciate counsel appearing for argument today via Zoom and we have your argument in the cases submitted. Thank you.